Hillsborough,⎰ No. 3729.
June 1, 1948.⎱

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, *&c.*

LOCAL UNION No. 633 *& a.*

*v.*

WILLIAM H. RILEY, ERNEST R. D'AMOURS AND JOSEPH E. FALTIN.

*H. Thornton Lorimer, Thomas F. Donovan* and *Francis E. Perkins* (*Mr. Lorimer* orally), for the plaintiffs.

*Ernest R. D'Amours*, Attorney General, and *Edward J. Reichert*, Law Assistant (*Mr. D'Amours* orally), for the defendants Riley and D'Amours.

*Hamblett & Hamblett* (*Mr. Robert B. Hamblett* orally), for the defendant Faltin.

164

*New Hampshire Federation of Labor, amicus curiae,* by *Richard F. Upton* and *Robert W. Upton.*

BRANCH, C. J. Before a hearing was held, the defendant Faltin, filed a motion that the petition be dismissed as to him, which reads as follows: "The Defendant Joseph E. Faltin moves as follows: That the petition be dismissed as to him because the petition does not set forth that the Defendant Faltin is claiming adversely to any right or title of the Petitioners and because the Petition does not set forth any facts from which it could be found that the Defendant Faltin is asserting a claim adverse to the Petitioners' rights and therefore the Petition is not within the provisions of Section 20 of Chapter 371 of the Revised Laws."

This motion embodies an erroneous theory as to the requisites of a petition for a declaratory judgment under our statute. R. L., *c.* 370, *s.* 20; *Faulkner* v. *Keene,* 85 N. H. 147. The purpose of the declaratory judgment law "is to make disputes as to rights or titles justiciable without proof of a wrong committed by one party against the other." *Faulkner* v. *Keene, supra,* 149.

In the present case, two statutes have been passed since the plaintiffs' contract with the defendant Faltin was executed, both of which, by their terms, are applicable thereto, the Labor Management Relations Act of 1947 (P. L. 101, 80th Cong., 1st ses., *c.* 120) passed by Congress June 23, 1947 over the presidential veto and known as the Taft-Hartley Act, and chapter 195 of New Hampshire Laws of 1947, known as the Willey Act. Which one of these statutes determines the validity of the contract between the plaintiffs and the defendant Faltin is a proper matter to be determined by a declaratory judgment in advance of actual controversy between the parties. The allegation of the petition that the plaintiffs have been threatened with prosecution under the Laws of 1947, *c.* 195, is an additional factor which indicates the propriety of the present proceeding. It must, therefore, be held that the order of the Superior Court dismissing the petition as against the defendant Faltin, was erroneous.

Chapter 195 of the Laws of 1947, known as the Willey Act, was approved and took effect upon June 14, 1947, thus antedating by more than two months the provisions of the Labor Management Relations Act of 1947, known as the Taft-Hartley Act, here involved, which were effective August 23, 1947. The Willey Act has been characterized by defendants' counsel as "a prohibitory and regulatory act." The prohibitory provisions are contained in section 21 and

provide that no person, firm or corporation shall make or agree to make membership or non-membership in a labor organization, or payment or non-payment of money to a labor organization a condition of employment or continuing of employment of any person. The chief regulatory provisions of the Act appear in section 21 (a) and provide that any person, firm or corporation, shall not be prohibited by section 21, from entering into any contract with a labor organization reached with his or its employees where at least two-thirds of such employees have voted affirmatively by secret ballot in favor of such contract in an election under the supervision of the Labor Commissioner. Such contract shall contain a clause providing that such labor organizations shall impose no discriminatory qualifications for membership in such organization based on race, color, national origin, etc., and a further clause providing that such labor organization shall grant to all members equal voting rights in such organization. It shall also contain a clause providing that no member shall be suspended or expelled from membership except for just cause. Section 21 (c) of the Act provides that section 21 shall not apply to existing contracts until the expiration thereof or until six months after the effective date of this Act, whichever shall be sooner.

A comparison of these provisions with those of the Taft-Hartley Law dealing with unfair labor practices (s. 8), demonstrates that the two acts deal with the same subject matter in much the same way. There are, however, many conflicts between the provisions of the Taft-Hartley Act and the Willey Act. The closed shop agreement under which the employer may hire only union members is entirely outlawed by the Taft-Hartley Act, while permitted under certain conditions by the Willey Act. In regard to the union shop under which an employer may hire non-union men of his own selection who, after a probationary period of employment must become union members as a condition of further employment, the Taft-Hartley Act permits such agreements when a majority of employees vote in favor of it, while the Willey Act requires a two-thirds majority to validate such contracts. Numerous other inconsistencies between the two acts are pointed out in the excellent brief of the petitioners.

The Constitution of the United States gives Congress jurisdiction over the entire field of interstate commerce, and since Congress has already preempted the subject of labor management relations within the field of interstate commerce, it follows from the paramount character of its authority that state regulation of the subject matter is excluded. *Texas & Pacific Railway Co.* v. *Rigsby,* 241 U. S. 33, 41;

*Public Service Commission* v. *Welch Co.*, 91 N. H. 328. "When Congress has taken the particular subject-matter in hand, coincidence is as ineffective as opposition." *Charleston &c. Railway Co.* v. *Company*, 237 U. S. 597, 604.

An application of these principles to the situation now confronting us would lead inevitably to the conclusion that the regulations of the Willey Act are superseded by the Taft-Hartley Act (*Hill* v. *Florida*, 325 U. S. 538; *Bethlehem Steel Co.* v. *N. Y. Labor Relations Board*, 330 U. S. 767) were it not for section 14 (b) of that act, which reads as follows: "Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." It is argued by the Attorney General that, by this provision, "Congress has expressly delegated to the states power to legislate in the field of union security clauses in labor contracts" and that "the net effect of the above section is a federal delegation of power to the several states to regulate security clauses in labor contracts in accordance with the public policy of such states."

We are unable to agree with this interpretation of section 14 (b). It does not read at all like a delegation of authority. On the contrary, it is phrased as a denial of authority to execute or apply certain forms of security contracts in states where they are prohibited by local law. We think that "prohibited" as used in this section, means forbidden, not merely frowned upon although permitted under certain conditions, which is the net effect of the Willey Act. To say that Congress, having undertaken to legislate elaborately in the field of "union security clauses" nevertheless proceeded to say, in section 14 (b), that the regulations which it had just laid down should be abrogated by the statutes of any state which might see fit to legislate upon the same subject, would seem to involve the conclusion that Congress thus produced a legislative nugacity which, if possible, is not to be presumed. Section 14 (b) simply says that local prohibition of "agreements requiring membership in a labor organization as a condition of employment" shall be given effect. It does not say that local regulation of such contracts shall take precedence over the Taft-Hartley Act.

Thus construed, section 14 (b) fits into the scheme of federal regulation expressed in the Taft-Hartley Act and at the same time gives recognition to the existing laws of the thirteen states which prohibit or outlaw all forms of compulsory unionism.

It is, therefore, our conclusion that there is nothing in section 14 (b) of the Taft-Hartley Act which abrogates the rule that "Congress, having entered this field of regulation, it follows from the paramount character of its authority that state regulation of the subject-matter is excluded." *Texas & Pacific Railway Co.* v. *Rigsby, supra,* and we accordingly hold that the regulatory provisions of the Willey Act are superseded by the Taft-Hartley Law as to the contracting parties and the individual plaintiffs herein.

*Judgment for the plaintiffs.*

BLANDIN, J., dissented: the others concurred.

BLANDIN, J., *dissenting:* The fundamental question before us is what did Congress mean by section 14 (b) of the Taft-Hartley Act? It is too elementary to require citation that in determining the meaning of legislation the intent of those who wrote it is of paramount importance. This should weigh far more than ingenious and subtle arguments which able counsel have marshalled since the passage of the act. To discover the intent we must consider the legislative history of the statute, including what was said and done at the time by the men who made it. At the outset it is of vital importance to note that the temper of the 80th Congress was to halt the massive invasion of states rights by the Federal government which had gone on for some years. Nowhere it seems was the check more plainly dealt than in the field which lies before us.

Turning to the question of intent we find the record showing that the men who sponsored the law and the men who fought it alike believed that it left with the states the power to regulate the question of compulsory union security. Originally section 13 of the House bill spelled this out in specific if rather lengthy terms. As a result of a conference between the House and the Senate, section 13 of the House bill was condensed into section 14 (b) of the enacted law. Both Senator Taft, speaking for the Senate conferees, and the House Conference Report stated flatly that section 14 (b) was to have the "same effect" as section 13 of the House act. (*Congressional Record,* Vol. 93, No. 106, page 6602; Report No. 510, House, 80th Congress, first session, page 60). Remarks by members of both the House and Senate, including those who advocated the bill and those who opposed it were unequivocal that such was their understanding. For what it may be worth, it was argued without objection by brief and orally

that the President, who presumably had followed the debate carefully and knew what was going on, in his veto message stated that his understanding of section 14 (b) was the same as that of the members of the House and Senate. Congressional Record, Vol. 93, No. 117, page 7503. It is fair to assume that had any contrary intent or understanding been expressed during the debate preceding the passage of this bill industrious counsel for the petititioners would have brought it to our attention.

There is no conflict between the Willey Act and the Taft-Hartley Act in the narrow issue before us. At the time as of which we must consider the constitutionality of the Willey Act, the closed-shop agreement between the petitioners and the defendant Faltin was not invalidated by either federal or state provision since the petitioners' contract antedated the Taft-Hartley Act and thereby remained valid under that law until its termination date on December 31, 1948. No election had been held prior to the transfer of the case to this court within the six months period under the state law which expired December 31, 1947. Had there been one, a successful vote would have resulted in the defendant Riley's certifying the existing contract valid until its termination date. What Congress in effect said to the states by section 14 (b) was simply this: You may have less union security by state legislation than the Hartley-Taft Bill provides but you cannot have more.

What little commentary there is on the subject appears to come out against the majority opinion. In an article "The Taft-Hartley Act and State Jurisdiction over Labor Relations" (Vol. 46) Michigan Law Review, Professor Russell A. Smith, page 598, states after quoting section 14 (b) "The legislative history of this provision confirms what is apparent on its face that Congress thereby desired to make clear its intent to leave the states free to deal with union security provisions, provided state action is not less restrictive than the federal act. The draftsmen simply wanted to make sure that the uncertainty as to state authority which, for some inexplicable reason, existed under the original NLRA should not obtain under the act as amended. The amended NLRA outlaws the closed shop as a form of discrimination, but permits the union shop under certain conditions. There is no question but that the states are not bound to tolerate even the union shop. They may, if they so desire, adopt the federal policy which applies under the Railway Labor Act and thus prohibit both the closed and the union shop. *Or, they may permit the union shop, but on conditions more restrictive than those provided by the*

*amended NLRA*. This is true, of course, whether the state imposes the limitations by legislation or by judicial decision." (Italics supplied.)

In this state it is fundamental law " 'that it has always been the practice in this jurisdiction to follow the universally accepted doctrine that the constitutionality of an act passed by the coordinate branch of the government is to be presumed. It will not be declared invalid except upon *unescapable grounds.*' " (Italics supplied.) *Chronicle &c. Pub. Co.* v. *Attorney General*, 94 N. H. 148, 151. The majority opinion in declaring the Willey Act invalid holds in substance that the conclusion is unescapable, that Congress intended the word "prohibit" to be given its narrowest and most restricted effect. Unless the legislative history is meaningless it indicates that if any conclusion is unescapable it is the opposite one from that which the majority opinion has reached. In *Bethlehem Co.* v. *N. Y. Labor Relations Board*, 330 U. S. 767, 780, Justice *Frankfurter* speaks as follows: "Since Congress can, if it chooses, entirely displace the States to the full extent of the far reaching Commerce Clause, Congress needs no help from generous judicial implications to achieve the supersession of State authority. To construe federal legislation so as not needlessly to forbid preexisting State authority is to respect our federal system. Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States."

To summarize, it appears that if we hold that the State retains its power to regulate we have a construction practical in application, consistent with the temper of the Congress which passed it and in accordance with the intent and understanding of both the friends who proposed the law and the foes who fought it. The majority opinion on the other hand gives us a narrow interpretation which seems not to consider the intent or the common understanding of the men who passed the law, and which seemingly resolves all doubts against, rather than for the validity of a state statute.